IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


MELVIN WILLARD WHITE,          )
                    Plaintiff  )
                               )
    vs.                        )          Civil Action No. 08-859
                               )          Magistrate Judge Lisa Pupo Lenihan
JEFFERSON COUNTY; JEFFERSON    )
COUNTY JAIL; CORRECTIONS       )          ECF Nos. 47 and 50
OFFICER CLARK; PRIMECARE       )
MEDICAL, INC.,                 )
                    Defendants )

## OPINION

Lenihan, M.J.

Melvin Willard White ("White" or "the Plaintiff") filed this action pursuant to 42 U.S.C.

§ 1983; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § §12101, et seq.; and the

Rehabilitation Act ("RA"), 29 U.S.C. §§ 791 et seq.

Following the Plaintiff's abandonment of claims against the Jail, claims relating to

medical treatment [1] and law library access, and claims arising under the Rehabilitation Act, [2]

three of the five counts set out in the Amended Complaint (ECF No. 36) remain.  In Count I,

White alleges  that Defendants, Jefferson County ("the County"), and corrections officer Donald

Clark ("Clark"), subjected him to punishment in violation of the Eighth and/or Fourteenth

---

[1]On November 26, 2008, the original Defendants joined an additional Defendant, PrimeCare
Medical, Inc.  ("PrimeCare") (ECF No. 16), which, in 2007, was the contractual provider of medical and
healthcare services for inmates at the Jail.  They did this "so that, if the plaintiff [is] able to prove . . .
allegations as to . . .  medical claims, an appropriate determination as to liability can be made." (Id. at §
11).  In response, PrimeCare filed a Motion for Summary Judgment (ECF No. 47).  In view of the fact
that the Plaintiff's medical treatment claims are no longer part of this case, (ECF No. 55 at 16 n.5),
PrimeCare's Motion will be granted.

[2] (ECF No. 54 at ¶ 100; ECF No. 55 at 16 n.5).

Amendments to the United States Constitution when, despite the fact that that he was paraplegic, he was admitted to the Jail, although it lacked the facilities, equipment, or staff essential to meet his basic needs. Specifically, White contends that, as part of a policy or custom, he was not supplied with a suitable bed, was denied assistance getting into or out of bed, and could not independently access the toilet or shower. He also asserts that Clark refused to assist him with getting out of bed to use the toilet, refused to clean him when he soiled himself, insulted him on the basis of his disability, and deliberately placed food beyond his reach. (Id. at ¶¶ 24-28, 31-33, 37-38).

Count III sets out Eighth Amendment claims based on the failure to train correcions officers in the requirements of the ADA, and alleges supervisory liability based on an inadequate system for evaluating and monitoring corrections officers' performance. (Id. at ¶¶ 64, 65).

In Count IV, White states that the County violated the ADA. Its failure "to provide [him] with accommodations which would permit him to move between his bed and his wheelchair, to use the toilet, [or] the shower resulted in [his] exclusion from or denial of services, programs and/or activities in violation of [the Act]." (Id at ¶ 69).

Pending is the Motion for Summary Judgment (ECF No. 50) filed on behalf of Clark and the County. This Motion will be granted.

## I.    BACKGROUND

### A.    White's 2004 Incarceration

The Plaintiff, Melvin Willard White, ("White") was rendered paraplegic in a 1999 work-related logging accident, and has since been confined to a wheelchair. (ECF No. 36 ¶¶ 7-8). Following that accident, White was incarcerated at the Jefferson County Jail ("the Jail") on three

occasions, the first of which was over a two day period beginning August 25, 2004. (Id. at ¶¶ 9,14; ECF NO. 55 Ex. D at 2)).[3]  Upon his admission to the Jail as a pre-trial detainee[4] charged with selling heroin and cocaine, White's treating physician notified then deputy warden Dunkle ("Dunkle") that White suffered from MRSA [5]  related decubitus ulcers, (ECF No. 55 Ex. A at 33), and required specialized care, including a pressure bed and VAC device, which the Jail did not have. (Id. ¶¶ 9,10; ECF No. 51 Ex. A. at 31).  The medical director at the Jail examined White, noting gangrenous ulcers on his buttocks, and his need for a trapeze to get from his bed to the commode. (ECF No. 52 at Ex. D).  Dunkle recalls that upon learning of White's condition, he called the district magistrate, asking that White be placed on house arrest, "because [the Jail] had no means of accommodating this gentleman." (ECF No. 55 Ex. F at 3).  When he was told that house arrest was not an option because White had been dealing drugs out of his home, Dunkle had officers book White and "started seeing what [he] could do about getting him transferred to a state facility that could accommodate his kind of disability."  (Id.).  On August 27, 2004, White, who was seriously ill, was transferred to Punxsutawney Hospital.  White's attending physician described the events surrounding White's admission as follows:

---

[3]The Plaintiff does not base any part of his claim for damages on his 2004 incarceration. "Rather, [he] points to what took place during this time as evidence of Jefferson County's policies and customs." (ECF No. 55 at 2).

[4]As a pretrial detainee, White would have been subject to Fourteenth as opposed to Eighth Amendment protection; under the Fourteenth Amendment. During his 2007 periods of incarceration, White was a convicted inmate subject to the Eighth Amendment.  Sentenced prisoners are protected only from punishment that is "cruel and unusual," while pretrial detainees are protected from any punishment. See Hubbard v. Taylor, 399 F.3d 150, 166-67 (3d Cir. 2005).  In either case, the "deliberate indifference" standard applies.

[5]  MRSA is an abbreviation for the condition known as methicillin resistant staphylococcus aureus.

> The patient was admitted to the hospital after being seen
> at the Wound Care Clinic. At those times he had refused
> admission and he was being treated as an outpatient but in between
> the first . . . and second appointment he had been arrested and was
> currently in the Jefferson County Jail and after . . . some discussion
> as to what the patient's disposition could be . . . he was placed on
> furlough and admitted to the hospital on bail. The patient was
> quite sick. He was septic. He had positive blood cultures for staph
> aureus. . . He was treated with antibiotics . . . . The remainder of
> his hospital course . . . revolved around finding a suitable
> disposition for the [him,] being that his court orders stated that he
> had to present to the Jefferson County Jail within one hour after
> discharge.

(ECF No. Ex. B. at 1). The plan was that White would be treated at home because the Jail could

not provide suitable medical care. While he was still in the hospital, White's attorneys filed a

Motion for Modification of Bail in the Court of Common Pleas of Jefferson County,

Pennsylvania. (ECF No. 55 at Ex. D at 3). (Id.).[6] This Motion was granted, and, upon his

discharge from the hospital, White was transferred to a nursing home. (ECF No. 55 Ex A at 9).

### B.    Changes at the Jail Between August 2004 and September 2007

Between White's 2004 and 2007 stays at the Jail, a number of changes were made. In

July 2006, PrimeCare was hired as the Jail's medical service provider. (ECF No. 52 Ex. F).

David Riley ("Riley") became the warden, and implemented a policy that disabled inmates would

fall under the supervision of the medical staff. (ECF No. 52 Ex. G at 2).

---

[6]Recognizing that White, who would be "coming to the Jail from the hospital, is wheelchair bound, and . . . cannot care for himself," Dunkle completed a Petition for Transfer, asking that the Department of Corrections ("DOC") transfer White from Jefferson County Jail to SCI- Laurel Highlands which had superior medical treatment facilities. (ECF No. 55 at Ex. E). In support of the request, he wrote that White and his attorney had requested an isolation cell with television and electricity, "which we do not have." (ECF No. 52 Ex. E). Dunkle testified at his deposition that if "the state has an inmate who has a medical problem, [SCI-Laurel Highlands] is where they send them, all of them, because they have a medical staff. There they have everything there to take care of them, you know, the medical problems that these people may have." (ECF No. 55 Ex. F at 7). By the time the DOC approved the transfer, White had already been taken to a nursing home. (Id. at 6).

Physical changes to the Jail were also made. "New doors were installed. Everything was sanded and painted and that type of thing, yes, a new heating system put in." (Id. at 11). Warden Thomas Ebel ("Ebel")-- who was deputy warden of the Jail at all times relevant to this action-- testified that there were also "three ADA certified cells put in to handle disabled people, that we didn't have in 2004." (Id. at 10).[7] These cells did not have call bells, but were equipped with a video camera so that inmates could signal a monitoring officer. That officer had a variety of cameras to watch. An inmate in these handicap cells could call to the medical department, or to an officer's post two feet (and two doors) away. Neither the medical department nor the officer's post was manned twenty-four hours a day, but officers came and went several times every hour. (Id. at 19). "There's an officer that checks every cell in the building at least once an hour. (Id. at 20).

The Inmate Handbook in effect during 2007 included an entry titled "Accommodations for Inmates with Disabilities" which fell under the heading "Medical Services." (ECF No. 67 Ex. D at 3; Ex. E at 3). The entry reads:

1.  Qualified health-care personnel will give you a medical, dental, and mental health screening/appraisal within a reasonable time of your commitment, in accordance with standards[.]

2.  JCJ's health care personnel, in conjunction with you, will determine if you have a disability, unless previously diagnosed by a certified health care professional, and will determine the level of accommodations you may need and provide the appropriate medical treatment, as required by the condition[.] JCJ's contracted health care provider has sole discretion in these matters.

---

[7]There is nothing in the record to establish definitively whether the three cells did, in fact, meet ADA requirements.

3.      In determining the type of auxiliary aid and/or service
necessary, consideration should be given to the requests
made by you[.] This information will be recorded in your
medical file. Your cooperation with medical staff assists
them in performing their duties[.]

4.      Special accommodations will be made when it is deemed
necessary for the safety and security of both you and JCJ
and is verified by medical staff[.]

(Id.). Ebel testified that at the time of White's 2007 incarceration, there was no policy or
procedure in place with respect to what information should be exchanged between the Jail's
corrections staff and its medical staff. (Id. at 10). The Jail did not have a policy regarding what
it would do "if an inmate with a disability said some kind of change ha[d] to be made to prison
operations." (Id. at 9). White was the only inmate at the Jail ever to have requested
accommodation for a disability. (Id. at 23). Corrections officers were not provided with training
regarding the requirements of the Americans with Disabilities Act. (Id.).

### C.    The September 2007 Incarceration

On September 12, 2007, White was transferred from SCI- Laurel Highlands to the
Jefferson County Jail for less than twenty-four hours so that he could testify against another
individual as part of a plea agreement. He arrived at the Jail and was placed in a handicap cell at
about 4:00 p.m. on September 12, after Clark was no longer on duty. (ECF No. 55 Ex. A. at 13;
Ex. G. at 3). Before he left duty that day, Clark was notified by warden Riley that White, a
paraplegic in a wheelchair, would be arriving for an overnight stay. (ECF No. 55 Ex. G at 2).
"At some point after midnight," in the early morning hours of September 13, White had an
"accident in [his] pants." (Id. Ex. A at 16). White describes the relevant events as follows:

I was left in the room alone with no way to get back into my
wheelchair, to get to the toilet, and my medicine was taken off of

me, so when I don't have my medicine, about six hours later I get diarrhea . . . from not having the medicine. I called and called for help and no one would come help, I had an accident in the bed.

Then I was forced to use a shower that wasn't a wheelchair accessible shower, and my wheelchair fell down over the six inch step that goes into the shower and I had no help. Those are my complaints about that stay.

(Id. at 13).

Clark reported to work on September 13, 2010 at 8:00 a.m. (ECF No. 2 Ex. K). At his deposition, Clark testified that he went to White's cell about twenty minutes later in order to help White dress in preparation for the 9:00 a.m. court appearance. When he opened the door to White's cell, Clark noticed "a really bad odor of feces. I looked in the cell [and White said,] "Hey, I had an accident[.]" ((ECF No. 51 at ¶¶ 27-28). Clark radioed corrections officer Rowe ("Rowe"), and the two men helped White into his wheelchair. White alleges that one of these officers -- he believed that it was Clark, but was not positive -- insulted him by asking if he was a child. (ECF No. 52 Ex. A at 15). There were feces on Whites hands and on the wall. (Id. at ¶ 29). Clark testified that he and Rowe donned surgical masks sprayed with Lysol in order to enter the cell, placed a plastic bag on White's wheelchair, and helped him transfer from the bed. As the officers wheeled White to the nearest shower, they agreed that Rowe would stay with him, while Clark got his clothes ready. Clark had a "really weak stomach." (ECF No. 51 at ¶ 33).

White alleges, and Ebel confirms that the shower to which White was taken was not a handicap shower, because the extent of his "accident" required that he be taken to the closest one. He was not put over the lip down into the shower, because the hose and nozzle could be extended to an area above a drain outside the actual shower. (ECF No. 67 Ex. E at 8). Rowe held the wheelchair so that it would not move. (Id. at 9). White cleaned where he could, then lifted

himself onto his arms while Rowe washed underneath.  (Id.).  Following the shower, Clark

dressed White, and put him in a sheriff's car.  After his court appearance, White was returned to

SCI-Laurel Highlands. (ECF No. 51 at ¶¶ 34-35).

### D.     The October 26-31, 2007 Incarceration

On October 27, 2007, White was released from SCI- Laurel Highlands, but was

immediately picked up by sheriffs and taken to the Jail based on a probation violation involving

the 2006 sale of cocaine.  (ECF No. 52 Ex. A at 25-26).  The day prior to White's return,  Riley

sent an email to Ebel, the booking officers, and the shift commanders:

> Be advised that Melvin White will be arriving tomorrow afternoon.
> He should be housed in a handicap cell, preferably G21 or G22, to
> allow medical easy access to him.  He is capable of taking care of
> himself because he did it all the time at SCI Laurel Highlands
> without assistance.  Medical will need to arrange for a mobile
> shower chair through Jefferson Manor to allow him to take
> showers in the booking area.

(Id. Ex. L).   White arrived at the Jail at about 4:00 in the afternoon of Friday, October 26, 2007,

and was taken to Clark for booking.  (Id. Ex. A at 27).  Clark began the intake process with

White in the processing room, but was interrupted.  Clark instructed White to wait for him in cell

G21. (Id. at 28).  While waiting, White experienced back pain, and rolled from his wheelchair

onto the bed.  (Id. at 29).  Clark eventually returned, and told White to come back out to booking

so that he could finish intake. White responded that he could not transfer from the bed to the

wheelchair without help because the bed was too low.  (Id. at 30).  According to White, Clark

"got really mad," stated that it was not his job to help White, and "slammed the door on

[White's] room."  (Id.).

Clark then called ("Ebel") to ask what he should do.  Given the communication from

SCI- Laurel Highlands indicating that White was "able to assist [with] care - transfers self[,]" (Id. Ex. G. at 17; Ex. M at 2), Ebel concluded that Clark's refusal to transfer from the bed was a "discipline problem[.]" **(**Id. at 14). Ebel went to White's cell, where White explained that he could not transfer to the chair, despite what the records showed**.** (Id. at 14-15). Another inmate, James Wideman ("Wideman"), who was housed in a nearly cell, testified that Ebel screamed at White, telling him he could do it and wouldn't get any help. (ECF No. 55 Ex. J at 7). Ebel asked White what additional equipment he needed, because he "had no idea who to even contact." (Id. Ex. G at 19). White told Ebel that this was Ebel's problem. (Id.). At that time, White did not state that he needed an electric bed, or that he had used an electric bed at SCI-Laurel Highlands. (Id).

Ebel testified that after he left White's cell, he consulted jail records to find White's emergency contact. He then telephoned White's wife or ex-wife, and was told that White needed a trapeze to help him get in and out of bed. (Id. at 20). She gave Ebel the name of the medical company with which White had an account. Ebel called Punxy Medical Company (Punxy"), and was told that they would arrange to secure a trapeze from their warehouse. (Id. at 21). About an hour later, Ebel called Punxy again, and was assured that a truck had been dispatched. When Ebel got home, he asked his wife, who had worked for White in his home as a private caregiver five or six years earlier, whether White had been able to get out of bed on his own. She replied that he had done so with the aid of a trapeze. (Id.; Ex. G at 3).

The trapeze was delivered to the Jail before midnight on the day of White's admission. (ECF No. 51 at ¶ 55). On October 27, after the trapeze was in place, Ebel visited White's cell where White stated that he could not and would not attempt to use the device. (ECF No. 52 Ex.

G at 24).  Ebel relayed these events to the medical department, and "several hours later, "called

Laurel Highlands . . .  to speak to somebody who had actually cared for [White]."  (Id. at 26).  A

floor nurse informed Ebel that White had been able to care for himself, but that he had done so

with the aid of an electric bed.  (Id)   According to Ebel, after this conversation, he contacted

PrimeCare nurse, Vonda Preston ("Preston") and "basically told [her] that [White] had an electric

bed . . . , does that make a difference, and if it does, we need to do something." (Id. at 27).  He

understood from the nursing staff they were "going to work on it."  (Id. at 28).  He also instructed

corrections officers working with White that until the medical department could make other

arrangements, if White needed help getting out of bed, they should contact the medical

department because the medical personnel were trained in how properly to get people in and out

of bed.  (Id.). If medical personnel were not available, the officers were  to lift White.  Ebel told

this to the booking officers, sergeants, and lieutenants, relying on them to pass this information

on to other officers. (Doc. 55 Ex. L at 44).

        The same morning, PrimeCare nurse Glenna Bodenhorn ("Bodenhorn") met with White

to conduct a medical assessment.  (ECF No. 55 Ex. Q).   He complained of dehydration because

he could not get out of bed to get a drink.  (Id. at 9).  Bodenhorn admitted that she did not chart

this complaint, and did not remember telling anyone about it.  She also acknowledged that

White's chart did not reflect any response to his complaint until October 29.  (Id. at 9-10).  On

that date, PrimeCare Physician's Assistant Cindy Cunningham signed an order directing that

White be given a water pitcher, an air mattress for his decubitus ulcers, a handicapped cell, a

shower chair, and that meals be placed where he could reach them from his bed.  (ECF No. 48

Ex. C at 12).

An October 30, 2007 an email from Preston to Linda Bernard, a registered nurse at Primecare, indicated that no one (presumably meaning Punxy Medical) "got back to [Preston] about [White's] room and the trapeze. I will call them again tomorrow and pester them some more. I looked at his trapeze and spoke with him about it, he says it's ok for getting himself up in bed, just not to get in his chair. He definitely needs help with that (so we did)." (ECF No. 52 Ex. S at 10). On October 31, 2007, Preston noted in White's chart that she had spoken with "Nancy" at Punxy Medical again about having someone come and look at White's cell to see if there were a better setup that would allow White to transfer himself. (Id. at 8).

In support of his claims, White next alleges that on one occasion during his October incarceration, Clark brought a lunch tray into the cell and told White to come and get it. White told Clark that he could not get out of bed, and Clark responded, "Well, my job isn't to deliver food to you." (Id. Ex A at 31). Clark then placed the tray on the sink out of White's reach, and told White that if he wanted the food, he should go get it or "beg like a dog and he'd bring it to me." (Id.). About thirty minutes later, another corrections officer came to collect the lunch tray. When White explained that he had not eaten, the officer gave him the tray. (Id. at 25).

White states that another time, he moved his bowels in his bed twice, and was forced to lie in his waste until the next day. (Id. at 32). He had these accidents in the evening, and was not permitted to shower himself until the next afternoon. (Id. at 32-33). A Shift Information Exchange Form dated October 28, 2007, reads: "Inmate White showered after bowel movement in his pants." (Id. at 34). White recalls that he had a separate accident, and that a corrections officer helped him in and out of his wheelchair so that he should shower a second time. He does not recall the length of time between the accident and the shower. (Id. at 35). He does know that

he had two showers during the last four days of his October stay.  (Id. at 34).

Bodenhorn testified that she changed the dressing on White's back a few times, and each time cleaned up a small amount of feces.  She did not know how long the feces had been there, but it could not be detected until she had his pants down.  (Id. at 7, 10).  She did not recall whether she brought this to the attention of corrections officers or other members of the nursing staff, or whether she asked White whether he was receiving assistance from the officers.  (Id. at 12).  Preston remembered that a corrections officer asked her for help getting White onto a chair. (Id. Ex. Q at 11).  She did not remember how many times she helped with transferring White, but specifically recalled only one.  (Id.).

Bodenhorn remembered that Clark would make fun of White, but couldn't recall his exact words.  (Id. at 4).  She recalled that Clark said more than once that he was "sick of cleaning up Mr. White's shit." (Id. at 12-13). Bodenhorn was then asked:

> Q.    Did you understand that to mean that Mr. Clark was actually providing assistance to Mr. White in times when he may have had an accident in the bed and he was kind of tired of that?
>
> A.    Right.

(Id. at 14).   The deposition transcript also includes the following exchange:

> Q.    Did you ever hear Mr. Clark refuse to clean up Mr. White?
>
> A.    No.  I think that he did it, he just didn't like it.

(Id. at 15).  She did not hear other officers make derogatory comments.  (Id)

On October 30, 2007, attorneys for White filed a Petition for Writ of Habeas Corpus in the Court of Common Pleas of Jefferson County, Pennsylvania.  (ECF No. 55 Ex. H).  The Petition was promptly granted, and On October 31, 2007, White was released to house arrest.

(Id. Ex. I).

## II. STANDARD OF REVIEW

Summary Judgment is appropriate only where there are no genuine issues of material fact. Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). While the moving party must demonstrate the absence of any genuine factual dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323(1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 586-87 (1986) (emphasis in original removed).

In evaluating the evidence, the court must view the facts and the inferences to be drawn therefrom in a light most favorable to the non-moving party. Anderson, 477 U.S. at 255. At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. When examining the record to see if there are genuine issues of material fact, the court's focus is on issue finding, not on issue resolution.

## III. ANALYSIS

### A. Constitutional Claims Under Section 1983

In order to establish a section 1983 claim, a plaintiff must show that the defendant acted under color of state law, and that, as a result, the plaintiff was deprived of a federal constitutional right. See Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

Because there is no dispute that the Defendants were state actors, the Court focuses on whether either transgressed White's rights under the Eighth Amendment.

1.      **Defendant Clark**

"The Cruel and Unusual Punishments Clause of the Eighth Amendment proscribes 'punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society.'" Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 417 (3d Cir. 2000) (footnote omitted) (quoting Estelle v Gamble, 429 U.S. 97, 102 (1976)). In order to establish an Eighth Amendment claim, a plaintiff must first prove "a sufficiently serious objective deprivation." Tillman, 221 F.3d at 418. This objective component is narrowly defined. "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). In cases alleging Eighth Amendment violations based on conditions of confinement, "federal courts have repeatedly held that the Constitution does not mandate that prisons provide comfortable surroundings or commodious conditions." Anders v. Gusman, No. 06-2898, 2009 WL 1269232 at * 4 (E.D. La. May 5, 2009) (citing Talib v. Gilley, 138 F.3d 211, 215 (5th Cir. 1998)). Only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. Hudson v. McMillian, 503 U.S.1, 9 (1992). A prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need." Wilson v. Seiter, 501 U.S. 294 (1991) (citing Rhodes, 452 U.S. at 347). These needs include "food, clothing, shelter, sanitation, medical care and personal

14

safety." <u>Griffin v. Vaughn</u>, 112 F.3d 703, 709 (3d Cir.1997).

Whether the required showing has been made depends on a number of factors "includ[ing] the length of confinement, the amount of time prisoners must spend in their cells each day, the opportunities for activities outside the cells, and the repair and functioning of basic physical facilities such as plumbing, ventilation and showers." <u>Tillery v. Owens</u>, 907 F.2d 418, 427 (3d Cir.1990). "The Court may also consider the extent of any injury actually incurred." <u>Lane v. Culp</u>, Civ. No. 05-576, 2007 WL 954101, at *5 (W.D. Pa. March 28, 2007) (<u>citing</u> <u>Cowans v. Wyrick</u>, 862 F.2d 697, 700 (8th Cir.1988)).

In addition to meeting the objective standard of deprivation, a Plaintiff seeking to establish an Eighth Amendment claim must demonstrate that "a prison official subjectively acted with a sufficiently culpable state of mind, i.e., deliberate indifference." <u>Tillman</u>, 221 F.3d at 418. <u>See also</u> <u>Granberry v. Chairman of Pa. Bd. of Prob. and Parole</u>, No. 10-1514, 2010 WL 3899634 at * 3 (3d Cir. Oct. 6, 2010) (citing <u>Estelle</u>, 429 U.S. at 104-05). This subjective component is also narrowly construed. A Defendant's conduct violates the Eighth Amendment "only if he knows that the inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994).

White contends that he has satisfied both of these requirements. Specifically, he argues that Clark "engaged in affirmative conduct that transgressed all standards of human decency" when he: 1) refused to help him get out of his bed; 2) failed to assist him with a shower; 3) allowed White to lie in his own feces; 4) failed to provide him with food; and 5) verbally

harassed him.[8]  (ECF No. 55 at 17).

The record shows that during White's eighteen hour stay at the Jail in September 2007, Clark's interaction with him was abrasive, but minimal.  Clark went to White's cell shortly after he came on duty, found him covered with feces, and, with officer Rowe, helped White into his wheelchair.  The officers agreed that Rowe would help White shower, and that Clark would help him dress.  White testified that one of the officers - he *thought* it was Clark- insulted him by asking him if he was a child.  This insensitive comment, even if it could reliably be attributed to Clark, does not implicate the Eighth Amendment.  See Green v. Dept. of Corr., No. 10-1447, 2010 WL 3511098 at *3 n.2 (3d Cir. Sept. 8, 2010) (citing  McBride v. Deer, 240 F.3d 1287, 1291 n. 3 (10th Cir.2001)) (explaining that "acts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment").

The evidence pertaining to Clark's actions during White's five day October 2007 incarceration is also deficient.  The record shows that on the day that he booked White into the Jail, Clark refused to help White off of his bed because he had received notification from the warden indicating that White could transfer himself.  It was unclear to Clark whether White's insistence that he could not get off of the bed on his own was a discipline issue.

White next alleges that Clark transgressed his Eighth Amendment rights when, taunting White,  he placed a food tray out of White's reach (ECF No. 53 Ex. A at 31).  The record shows,

---

[8]To the extent that White seeks monetary damages from Clark in his official capacity, his request for relief is dismissed.  See Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (states, their agencies, and their employees are not, in their official capacities, "persons" subject to suit under 42 U.S.C. § 1983).

though, that White's meal was delayed by a matter of minutes, and there is no evidence of another food-related incident. Although Clark's alleged conduct was reprehensible, it was not the sort of "sufficiently serious objective deprivation" required to establish an Eighth Amendment violation. Tillman, 221 F.3d at 418.

The Court turns next to White's contention that Clark let him lie in his own feces. On September 13, when Clark found White covered with feces, he and another officer immediately helped White into his wheelchair, and White was taken to the shower. Bodenhorn testified that although Clark stated that he was "sick of cleaning up Mr. White's shit, (ECF No. 52 Ex. Q at 12-13), she understood Clark to mean that he had attended to White, but didn't like doing it. Bodenhorn also testified that on other occasions, there was no way to tell in advance that White had soiled himself. Thus, Clark could not have known that White had soiled himself, and could not, therefore, have been deliberately indifferent to White's hygienic needs.

Finally, White maintains that Clark failed to assist him with showers. The only record support for this allegation is the deposition testimony of Wideman, one of White's fellow inmates. Wideman testified that on one occasion, Clark told White that "he wasn't his father" and "he wouldn't wash his ass." (ECF No. 55 Ex. J at 5). White testified that he was, in fact, allowed to shower twice during the last four days of his incarceration. (Id. Ex. A. at 34-35). Clark's single refusal to accede to White's request for a shower fails to meet the Eighth Amendment's requirement of a serious objective deprivation.

The allegations against Clark, considered singly or in combination, are insufficient to establish an Eighth Amendment violation.

### 2.     Jefferson County- Eighth Amendment Municipal Liability

### a.  **Custom or Policy**

A municipality may be liable under § 1983 where a plaintiff is able to demonstrate that the municipality, through the implementation of a municipal policy or custom, caused a constitutional violation.  In order to survive summary judgment on his Eighth Amendment claim against Jefferson County, White must demonstrate both the existence of a policy or custom, and its connection to a constitutional injury.  A government policy exists when a " 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir.1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469,  (1986)).  "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." Id.  (quoting Monell, v. Dept. of Soc. Serv. Of City of New York, 436 U.S. 658, 690 (1978)).  In either instance, "the Plaintiff[ ] ha[s] the burden of showing that a government policymaker is responsible for acquiescence to the policy or custom," id. (citing Andrews, 895 F.2d at 1480), and for establishing a "direct causal link between a municipal policy or custom and the alleged constitutional violation."  City of Canton v. Harris, 489 U.S. 378, 385 (1989).  See also Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 405 (1997).

White's argument with respect to municipal liability is convoluted as well as unsupported by citation to legal authority.  He begins by arguing that "Warden Ebel should be considered a policymaker with respect to decisions regarding how issues involving Mr. White and the handling of his disability should be addressed."  (ECF No. 55 at 19).  The record unequivocally establishes, however, that Ebel was not "a decisionmaker possessing final authority to establish municipal

policy" regarding the Jail's treatment of disabled inmates. <u>Andrews</u>, 895 F.2d at 1480. In 2007, Ebel was the deputy warden, and was "second in command of the building." (ECF No. 55 Ex. L at 5). The transcript of Ebel's deposition reads:

> Q. Were you responsible for developing any policies or procedures that would govern how the . . . Jail ran?
>
> A. No.
>
> Q. Was that the warden's responsibility?
>
> A. Yes. The warden, yes.
>
> *     *     *     *
>
> Q. Who is responsible for establishing the policies that are followed by the Jefferson County Jail?
>
> A. The warden.
>
> Q. Is the warden the final word on what policies are followed, or does it have to be reviewed by some - -
>
> A. It has to be reviewed by the Jefferson County Jail Board of Inspectors.

(<u>Id.</u> at 5-6).

This evidence alone is fatal to White's attempt to establish municipal liability on the basis of a policy. White recognizes as much when he states: "Even if the Court were to find that Ebel did not have policymaking authority, liability can still be imposed on Jefferson County on the basis of an unconstitutional custom." (ECF No. 55 at 20). White recognizes that he was the "only inmate who required accommodation for his disability," and alleges he failed to receive accommodation during his two 2007 stays at the Jail. (<u>Id.</u>). He states: "Based upon this course

of conduct, a jury could find that Jefferson County had a custom of failing to accommodate the needs of disabled inmates in general and Mr. White in particular." (Id.). [9]

The record, of course, says nothing about the needs of disabled inmates in general. Moreover, the evidence pertaining to White's incarceration fails to establish that Ebel, or any other decisionmaker with final authority to make policy was aware of the alleged shortcomings in White's care in September 2007, or acquiesced in an alleged violation of White's constitutional rights in October 2007. White's allegations do not establish an actionable policy or custom, nor has he established a violation of his constitutional rights. He has, therefore, failed to establish the "stringent requirements for municipal liability" under section 1983. Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

### b. Failure to Train

In a three sentence argument accompanied by a single citation to the Supreme Court's holding that the requirements of the ADA are binding on prisons, see Pennsylvania Dept. of Corr.v. Yeskey, 524 U.S. 206 (1998), White asserts this Eighth Amendment [10] claim: "Jefferson County's failure to train its corrections officers on the obligations imposed upon

---

[9]White also refers to the fact that in 2004, Dunkle made arrangements to have White transferred to another facility when it was clear that he was too ill to be cared for at the Jail. He argues that Dunkle's efforts established a custom which Ebel should have followed. The Court does not attempt to analyze this argument, because it is clear that Dunkle's 2004 decision rested on the Jail's inability to provide White with adequate medical care. In 2007, on the other hand, the Jail addressed White's disability. Moreover, both the system for delivering medical care, and the physical plant in which White was housed differed significantly in 2004 and 2007. White's assertion that Ebel was obligated to follow a "custom" established by Dunkle lacks merit.

[10]It is clear that White raises the failure to train claim in the context of the Eighth Amendment, and does not allege an ADA violation based on failure to train. While it does not consider whether a failure to train claim made under the ADA would be cognizable, the Court strikes a cautionary note, observing that the absence of training for medical and correctional staff regarding the needs of disabled inmates and what constitutes discrimination under the ADA could, in another context, be problematic.

them by the [ADA] constituted deliberate indifference to the rights of disabled inmates with whom those officers may have come into contact." (ECF No. 55 at 21). The County is entitled to summary judgment on this claim. First, the "rights of disabled inmates with whom [Jail] officers may have come into contact" are not at issue; this case is about a single disabled inmate, White, and a single corrections officer, Clark.

The Court has found that Clark's actions with respect to White did not rise to the level of an Eighth Amendment violation. It follows that the County's failure to train Clark was not the cause of a constitutional injury. "A section 1983 claim based on failure to train cannot survive summary judgment, unless there is " a link between the act or omission and the ultimate injury." Diaz v. Carroll, 570 F.Supp.2d 571, 577 (D.Del. 2008) (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)).

### C.     Failure to Supervise

Here, White criticizes the evaluation process for corrections officers, arguing that the absence of written evaluations and the lack of formal input from all supervisors "combined with Warden Ebel's statement that Jail personnel were not going to help Mr. White led . . . Clark and other personnel at the Jefferson County Jail to believe that they could violate Mr. White's constitutional rights with impunity." (Id. at 21-22). In order to establish supervisory liability under the Eighth Amendment, a plaintiff must point to evidence showing: "(1) the existence of a policy or practice that created an unreasonable risk of an Eighth Amendment violation; (2) the supervisor's awareness of the creation of the risk; (3) the supervisor's indifference to the risk; and (4) that the plaintiff's injury resulted from this policy or practice." Estate of Chance ex rel Humphreys  v. First Corr. Med., Inc., No. 08-4220, 2009 WL 1758830 at * 3 (3d Cir. June 23,

2009) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989). In light of these

requirements, White's claim is altogether deficient. First, it is unclear against whom the claim is

made. Neither Riley nor Ebel is named as a Defendant, and White does not identify any other

individual with the authority to establish evaluation procedures. The County is not a proper

defendant. "[W]hen supervisory liability is imposed, it is imposed against the supervisory

official in his individual capacity for his own culpable action or inaction in the training,

supervision, or control of his subordinates." Clay v. Conlee, 815 F.2d 1164, 1170 (8th

Cir.1987).[11] See also Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 2008) (reiterating that

respondeat superior liability is not available under section 1983). White's claim is also doomed

by the lack of an evidentiary link between the evaluation process and any constitutional injury.

**B.**     **Claims Based on the ADA**

"The Supreme Court has recognized that Title II [of the ADA] prohibits 'a somewhat

broader swath of conduct' than the Constitution itself forbids." Allen v. Morris, No.

493cv00398, 2010 WL 1382112 at *7 (E.D. Ark. Jan. 6, 2010) (quoting United States v.

Georgia, 546 U.S. 151, 157 (2006)). "The ADA prohibits the exclusion of otherwise qualified

participants from any program or benefits on account of their disability." Iseley v. Beard, No.

05-2108, 2006 WL 2806985 at *4 (3d Cir. October 3, 2006). "To establish a violation of Title II

of the ADA, an inmate must allege that: (1) he is a qualified individual with a disability; (2) he

---

[11]All of the Defendants are sued in their individual and official capacities. The law does not
permit recovery of monetary damages against defendants in their official capacities. See Will v.
Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (states, their agencies, and their employees are
not, in their official capacities, "persons" subject to suit under 42 U.S.C. § 1983).

was either excluded from participation in or denied the benefits of some public entity's [12] services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.  See 42 U.S.C. § 12132;  Robertson v. Las Animas County Sheriff's Dep't, 500 F.3d 1185, 1193 (10th Cir.2007)."  Lopez v. Beard, No. 08-3699,  2009 WL 1705674 at *4 n.1 (3d Cir. June 18, 2009) (footnote added).  "ADA claims do not require proof of deliberate indifference; nevertheless, to receive compensatory damages for an ADA violation, a plaintiff must show 'intentional discrimination.'"  Id.  (citations omitted). Allen, 2010 WL 1382112 at *7.

It is undisputed that White has satisfied the first element of an ADA claim.  With respect to the second element, he states: "Jefferson County violated the [ADA] by failing to take reasonable steps to ensure that he could escape the confines of his bed and meet the most basic of his bodily needs." (ECF No. 55 at 23).  The County argues that this allegation fails to implicate the denial of access to any service, program or activity within the purview of the Act. [13]  For

---

[12]The Supreme Court held in Yeskey, 524 U.S. at 206  that Title II of the ADA applies to prisons and prison services.

[13]Although there is case law from this District holding that "using the toilet, sink and shower facilities or being able to dress oneself , are not programs or activities as contemplated by Title II of the ADA, any more than sleeping is," Thomas v. Pa. Dept. Of Corr., 615 F. Supp.2d 411 (W.D. Pa. 2009), there is authority to the contrary.  See Lee v. Sherrer, No. 06-2716, 2009 WL 901777 at * 5, (D.N.J. March 31, 2009) (evidence of exclusion from programs and benefits such as . . . showering privileges on the basis of disability stated claim under ADA);  Brant v. Volkert,, 99-C-50154, 2001 WL 901106 at * 2 (N.D. Ill. July 5, 2001) ("use of a toilet is arguably a 'service' of the prison"); Schmidt v. Odell, 64 F. Supp. 2d 1014, 1032 (D. Kan. 1999) (benefits and basic services of the jail, for purposes of the ADA included "use of the toilet, shower, recreational areas, and obtaining meals.") See also dicta in United States v. Georgia, 546 U.S. at 157 (finding it "quite plausible that alleged deliberate refusal of prison officials to accommodate . . . disability-related needs in such fundamentals as mobility, hygiene  . . .  and virtually all other prison programs"  implicate prisons "'services, programs, or activities.'") (quoting 42 U.S.C. § 12132).

purposes of this opinion only, the Court will assume that the County is wrong, and that basic needs such as shower and toilet access are covered by the Act.  Nonetheless, White's ADA claim is fatally flawed.

First, the record fails to show that White was the victim of discrimination.  Under Title II, it is "the failure of a public entity to provide disabled persons with *reasonable* modifications [that] constitutes discrimination within the meaning of the act." Muhammad v. Dept. Of Corr., 645 F. Supp 2d 299, 313 (D. N.J. 2008) (emphasis added) (citing Townsend v. Quasim, 328 F.3d 511, 517 (9th Cir. 2003)).  See also 28 C.F.R. § 35.130 (b) (7) (requiring public entity to make "reasonable modifications in policies, practices, or procedures when  modifications are necessary to avoid discrimination on the basis of disability").  Under the ADA, "a determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry." Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995).  In the prison setting, "the type of accommodation that will be enough to satisfy the [ADA]'s reasonableness requirement must be judged in light of the overall institutional requirements.  Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account." Love v. Westville Corr. Ctr, 103 F.3d 558, 561 (7th Cir. 1996) (internal citation omitted).

The reasonableness inquiry in this case shows that the focus of White's ADA claim is, in chief, on his five day October 2007 incarceration.  As the Court has discussed in detail, when White arrived at the Jail, the only information available to Jail personnel was that White was able to care for his own needs.  He was placed in a camera monitored handicap cell close to the medical department and "two feet away" from the officers' post.  Although the medical department was only staffed for twelve hours a day, officers visited  the post several times per

hour, and an officer visited each cell once an hour. There was a door with an open slot in it and a closed door between White's cell and the officers' post. White could see officers passing by his cell, and would call to them if he needed them. (Doc. 52 Ex. A at 13).

When it became apparent that White could not move from his bed to the chair, and was not simply refusing to do so, Ebel took immediate steps to determine what was needed, calling White's emergency contact, Punxy, and the floor nurse at SCI-Laurel Highlands. He then went to PrimeCare staff which also contacted Punxy. When the nurse did not get a satisfactory answer from Punxy on the first call, she noted that another call would be placed. In the meantime, Ebel directed corrections officers to get help from the medical department if White needed to be lifted, or to lift him themselves, if necessary. In addition, when Punxy recommended that White be given a trapeze to help him get out of bed one was immediately ordered by Ebel.

White was showered on the evening shift of October 28, after having had two bowel movements in his pants. He was given a second shower after another accident. The record does not establish that White showered any less often than inmates who were not disabled. Moreover, he was cleaned every time that his ulcers were treated. White does not allege that nurses or corrections officers refused to help him get to the toilet when they knew he needed to go. On day five, when White left the Jail, there is evidence of ongoing efforts to solve White's mobility problem.

On the basis of the record, the Court finds that no reasonable jury could conclude that the efforts made to accommodate White's disability --though perhaps not perfect-- were not reasonable in the overall circumstances and the limited period of his incarceration. White has

thus failed to establish discrimination within the meaning of Title II of the ADA.  See

Muhammad, 645 F. Supp 2d at 313 (D. N.J. 2008) (it is the failure to provide reasonable

accommodation that constitutes discrimination under the ADA).  The Court similarly concludes

that no reasonable jury could find that White's  lack of free access to toilet facilities and showers

was, except in a but for sense, attributable to his disability.  Any difference in treatment between

White and other inmates was based not on discrimination, but on the Jail's inability to identify

and secure the necessary equipment in the narrow time frame encompassed by his claim.

**IV.     CONCLUSION**

For the reasons set forth above the pending Motions for Summary Judgment (ECF Nos.

47 and 50) will be granted.  Appropriate Orders follow.


Dated:   December 17, 2010                                    BY THE COURT:

                                                              _____
                                                              LISA PUPO LENIHAN
                                                              Chief United States Magistrate Judge



cc:      Counsel of Record via CM-ECF